```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

 PAUL SMEDBERG,                        :
                                       :
      Plaintiff,                       :
                                       :
 v.                                    :     No. 3:03CV1178(DJS)
                                       :
 STATE OF CONNECTICUT                  :
 DEPARTMENT OF TRANSPORTATION,         :
 and in their individual and           :
 official capacities, JAMES F.         :
 BYRNES, JR., Commissioner of          :
 Transportation; KENNETH J.            :
 ROBERT, Director of Aviation          :
 and Port Administrations;             :
 STEPHEN MARKWALD, Director of         :
 Personnel; ROBERT BISSELL,            :
 D.O.T. Security Officer; and          :
 MICHAEL MORRISON, D.O.T.              :
 Security Officer;                     :
                                       :
      Defendants.                      :
```

## MEMORANDUM OF DECISION

On July 8, 2003, plaintiff Paul Smedberg filed this action alleging that defendants, the State of Connecticut Department of Transportation ("DOT"); James F. Byrnes, Jr., Commissioner of the DOT; Kenneth J. Robert, Director of Aviation and Port Administrations; Stephen Markwald, Director of Personnel; Robert Bissell, Security Officer; and Michael Morrison, Security Officer; violated his rights secured by the First Amendment to the U.S. Constitution and his right to equal protection under the law, as guaranteed by the Fourteenth Amendment to the U.S.

Constitution in violation of 42 U.S.C. § 1983.[1]  On December 16, 2004, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, defendants filed a motion for summary judgment.  (See Dkt. # 46).  For the reasons set forth herein, defendants' motion is **GRANTED**.

## I. FACTS

Paul Smedberg became a law enforcement officer ("LEO") at the Groton-New London Airport ("GOL") in June of 1999.  GOL is a small state-owned and operated airport that fields charter flights, private flights, corporate sponsored flights, and National Guard aviation activity.  During the relevant time period, one commercial carrier operated out of GOL and scheduled between three and four flights per day.  As a LEO, Smedberg provided security for the airport grounds and its buildings and, in 2002, provided backup to persons conducting the passenger screening process.  LEOs were also trained to fight aircraft fires and test runway conditions in inclement weather.  As LEOs, Smedberg, Mayloid Perkins, Patricia Macek, and Steven Dubin were under the supervision of Master Sergeant Bertram Peltier, who in turn reported to Catherine Young, the Airport Manager.

During the relevant time period, the pertinent DOT chain of command was as follows.  James Byrnes was the DOT Commissioner, James Adams was the Deputy Commissioner, and Louis Cutillo was

---

[1] Smedberg has withdrawn all other claims.

the Deputy Commissioner, Bureau of Aviation and Ports.  Kenneth Robert reported to Cutillo, and was the Transportation Aviation Administrator in the Bureau of Aviation and Ports.  Robert was responsible for managing the six airports under the DOT's control, including GOL.  Michael Morrison was the DOT Director of Security, and Robert Bissell was an investigator in the Security Unit.  Bissell also reported to Dave Crowther, Director of Management Services.  Michele Pancallo was the Director of Human Resources, and Stephen Markwald was a personnel officer.

Defendants claim that, in 2002 upon the passage of the National Transportation Security Act and the creation of the federal Transportation Security Administration ("TSA"), LEOs, via delegation of responsibility from the TSA, undertook the task of providing armed backup with arrest authority to the air carrier performing the screening of flight passengers.  Immediately after the terrorist attack of September 11, 2001, the National Guard and the Connecticut State Police performed these tasks at GOL.  Defendants claim that, as of May 29, 2002, LEOs became responsible for inspecting the terminal one hour prior to the start of the screening process, observing the flow of vehicles to the terminal, inspecting the perimeter of the terminal, and being present at the checkpoint until the plane has departed.  These TSA assignments coincided with the boarding of commercial flights and took place in three two-hour blocks on Sunday through Friday

and two two-hour blocks on Saturday.  One LEO was assigned to cover the TSA shift while another LEO assumed regular patrol duties.  Defendants claim that LEOs were ordered to cover these TSA assignments even if the LEOs had to work overtime to do so.

The performance of TSA assignments at GOL became the subject of an investigation conducted by Bissell at Morrison and Crowther's direction.  An anonymous phone call to Bissell on August 21, 2002 alleging, among other things, that the LEOs failed to comply with TSA standing orders, falsified time and payroll records, and generally neglected duty assignments, prompted the investigation.  The investigators conducted surveillance, reviewed pertinent records, and interviewed persons involved.  While at GOL observing the LEOs on October 10, 2002, an investigator noted that Perkins arrived at 5:35 a.m. for the third (11:00 p.m. to 7:00 a.m.) shift, and that the duty log and time sheets falsely indicated that Perkins had arrived at 11:00 p.m., had worked an entire shift, and had done certain tasks while he was actually not present.  Smedberg was working the third shift on October 10, 2002, and he did not report or otherwise note Perkins's absence in any paperwork.  On October 23, 2002, upon being confronted with the investigator's observations, Smedberg and Perkins submitted written statements admitting that they have been paid for time they did not actually work.  Crowther forwarded the final report of the investigation

to Robert on December 26, 2002.  The investigators concluded the following:

> The evidence brought forth during this investigation through surveillance, interviews, and records analyze[d] has substantiated that at [GOL] Airport there has been:
>
> 1. Noncompliance of [sic.] TSA standing orders by Officers Macek, Smedberg, and Perkins.
> 2. Neglect of duty by Officers Macek, Smedberg, Perkins, and M/Sgt. Peltier.
> 3. Failure to properly supervise employees by Officers Perkins and M/Sgt. Peltier.
> 4. Falsification of time sheets/payroll sheets/duty logs by Officers Smedberg and Perkins.
> 5. Attempts to cover-up noncompliance of [sic.] TSA standing orders and work schedules by Officers Smedberg and Perkins.
> 6. Failure to provide a safe transportation environment for the general public by Officers Macek, Smedberg, Perkins, and M/Sgt. Peltier.

(Dkt. # 46 Ex. 11 at 13.)

After submission of the investigative report, the DOT initiated disciplinary proceedings against those employees implicated in the investigative report.  On January 22, 2003, Smedberg received a letter scheduling a pre-disciplinary meeting for January 28, 2003.  The pre-disciplinary fact-finding proceeding took place over the course of four days before a panel of Robert, Pancallo, and Walter Coughlin, Engineering Administrator.  The panel questioned witnesses, reviewed documents, and fielded questions from those subject to discipline and their union representative, who was also present.  By report

dated March 19, 2003, the panel found that Smedberg (1) failed to report Perkins's absence from duty on October 10, 2002; (2) was complicit in Perkins's falsification of GOL paperwork regarding his absence on October 10, 2002; (3) was using a gym on the property with Perkins during his shift and during a designated TSA assignment on October 23, 2002; (4) and did not comply with TSA standing orders.  With respect to the falsification of GOL paperwork, the panel found that

> Officer Perkins falsified his attendance on the October 10, 2002 third-shift assignment.  Officer Smedberg was witness to this and failed, even as a trained police officer, to report it as a wrongful act.  Written statements, taken from both officers during the investigation, attest to the fact that they knowingly conspired in this cover-up.  The most compelling evidence of this was the log entry of October 10, 2002, in Officer Perkins'[s] handwriting that documented the shift for which, following surveillance, he admitted he was not present throughout.  Officer Smedberg had left room in the duty log for the entries to be made at the end of the shift as an indication that Officer Perkins was actually present.  This level of complicity in such a scheme encompassed dereliction of duty.  Their written statements indicate that this activity was more than a one-time occurrence.

(Dkt. # 46 Ex. 14 at 1-2.)  The panel recommended that Perkins and Smedberg be terminated from their positions, that Macek be suspended for three days without pay, and that Peltier be demoted to police officer.

On April 15, 2003, Smedberg received written notification that his employment with the DOT was being terminated as of April 29, 2003.  The DOT informed Smedberg that,

> [b]ased upon the information gathered, it has been
> determined that you knowingly accepted pay for time not
> worked; you participated in falsifying the police log;
> and you neglected to fulfill the full range of duties
> and responsibilities as a Law Enforcement Officer as
> they relate to the federally mandated requirements of
> the Transportation Security Administration Checkpoint
> (TSA) and airport procedures.  Your neglect of duty by
> working out at the Connecticut National Guard gym while
> on state time compromised the airport's ability to
> comply with the TSA requirement resulting in a
> potentially unsafe transportation environment.

(Dkt. # 46 Ex. 15.)

Smedberg claims that he was neither formally ordered nor adequately trained to undertake TSA assignments.  When the question of whether LEOs wanted to perform TSA functions was raised, Smedberg indicated that he did not wish to perform these tasks because of his lengthy commute from his home to GOL.  Apparently, the TSA duties were set forth in a series of memoranda dated May 1, 2002, June 9, 2002, and November 19, 2002, and were explained to the LEOs by Peltier in a meeting prior to May 29, 2002.  Smedberg believes that the initial two memoranda were not standing orders, but rather that TSA assignments were undertaken strictly on a voluntary basis.  Smedberg attended the meeting with Peltier, but claims to have left in the middle of the meeting.  Smedberg recollects that Peltier did not summon him back to the meeting, inquire about his absence, or seek to brief him on the subject matter discussed at the meeting.   Smedberg also claims that he was not required to "read and sign" for the May 1, 2002 and June 9, 2002 memoranda in contrast to the

established procedure for the promulgation of standing orders. Generally speaking, Smedberg rarely worked TSA shifts because he did not request to work TSA shifts and the commercial flights did not usually take place during the third shift.

Smedberg also alleges that he was terminated in retaliation for filing grievances regarding the work conditions at GOL. Between late 2001 and early 2002, Steve Cox, who represented Smedberg and other LEOs in the Protective Services Employee Coalition union, filed several grievances with Young requesting the following: a claim that one-man LEO shifts jeopardized LEO safety; a request to issue bullet-proof vests to LEOs; a request to issue larger caliber ammunition and weapons to LEOs; a request to issue updated radios to LEOs; a claim that airfield inspections should not be performed by LEOs; and a claim that LEOs should not perform housekeeping functions at the police and fire station.  In addition to these grievances,[2] Smedberg claims that he complained to Peltier regarding "the need for bullet proof vests and for better duty weapons and vehicles."  (Dkt. # 59 Ex. A ¶ 13.)  Smedberg also claims that, "[i]n 2002, I went to the Master Sergeant Peltier with complaints about safety and Peltier told me that Ken Robert[] had instructed him to 'squash' any more grievances or else," (id., ¶ 16), and that "I

---

[2] In February of 2001, Smedberg also made a complaint about Dubin and alleged that Dubin hindered a prosecution.

voluntarily went to the Master Sergeant with complaints, not as part of my job duty but out of my personal concern for safety in the department," (id., ¶ 17).

## II.  DISCUSSION

Smedberg alleges that defendants terminated his employment in retaliation for his protected speech regarding workplace safety.  Smedberg also claims that defendants' decision to terminate his employment was irrational in view of the less severe discipline imposed upon similarly situated individuals.  Defendants claim that their decision to terminate Smedberg was not the product of illegal retaliation or otherwise irrational.

### A.  STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l

Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### B. FIRST AMENDMENT RETALIATION

Smedberg claims that defendants terminated his employment in retaliation for his speaking out on matters of public concern in violation of the First Amendment to the U.S. Constitution.  He argues that his commentary regarding safety procedures led to his termination, and that he was therefore denied rights to which he is entitled pursuant to 42 U.S.C. § 1983.

A public employer cannot discharge or retaliate against an employee for the exercise of the employee's First Amendment rights.  See Perry v. Sinderman, 408 U.S. 593, 597 (1972).  Thus, in Pickering v. Board of Education, 391 U.S. 563 (1968), the Supreme Court struck a balance between the right of the employee to speak and the employer's interest in effectively conducting

its affairs.  "The Pickering test involves a two-step inquiry: first, a court must determine whether the speech which led to an employee's discipline relates to a matter of public concern; and, second, if so, the balance between free speech concerns is weighed against efficient public service to ascertain to which the scale tips."  Melzer v. Board of Education of City School Dist. of City of New York, 336 F.3d 185, 193 (2d Cir. 2003).  To succeed on his First Amendment claim, Smedberg "must demonstrate by a preponderance of the evidence that the speech at issue was protected, that []he suffered an adverse employment action, and there was a causal connection between the protected speech and the adverse employment action."  Blum v. Schlegal, 18 F.3d 1005, 1010 (2d Cir. 1994).

The threshold issue is whether Smedberg's speech relates to matters of public concern such that it is worthy of First Amendment protection.  "Pickering's balancing test applies only when the employee speaks 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest.'"  Harman v. City of New York, 140 F.3d 111, 117 (2d Cir. 1998) (quoting Connick v. Myers, 461 U.S. 138, 147 (1983)). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the

-11-

judiciary in the name of the First Amendment." Connick, 461 U.S. at 146. As such,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Id. at 147. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999).

Smedberg's speech is not protected by the First Amendment because he spoke as an "employee upon matters only of personal interest." Connick, 461 U.S. at 147. Smedberg argues that he spoke on matters of public concern because he advocated measures to improve LEO safety at GOL. The subjects about which he spoke, including the issuance of bullet-proof vests and better equipment, however, do not transcend the ordinary issues associated with working for a law enforcement agency. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case." Id. at 149. Although, in some instances, problems in a public workplace

may be intrinsically significant enough to warrant public attention, the matters about which Smedberg has spoken are not of the character expected to be of special importance to the public at large, notwithstanding his professed desire to improve public safety in general.  Cf. Nichol v. ARIN Intermediate Unit 28, 268 F. Supp. 2d 536, 558 (W.D. Pa. 2003) ("On the other side of the public concern coin [from comments upon matters outside the issues of the workplace], and presenting more complexity, are employees' comments directed internally at issues in or affecting the workplace, ranging from idle office gossip and chit-chat (usually not public concern speech) to comments about safety, performance, corruption and other such larger issues of general interest to the public (usually deemed to be matters of public concern).").  Defendants' motion is therefore granted with respect to Count One of the Amended Complaint.

C.   EQUAL PROTECTION

Smedberg claims that defendants violated his right to equal protection under the law by imposing an disproportionately harsh sanction upon him for his conduct described in the investigative report.   The Fourteenth Amendment to the United States Constitution provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws," and is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne, Texas v.

-13-

Cleburne Living Center, 473 U.S. 432 (1985).  Traditionally, equal protection claims were premised on the idea that the plaintiff was a member of a protected class.  The Supreme Court has held, however, that a plaintiff need not be a member of a traditionally "protected class" in order to allege an equal protection violation.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Instead, a "class of one" may maintain an equal protection claim "where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Id.

"In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high."  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005).  As such, a plaintiff who brings a "class of one" claim must prove that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake."  Id. at 105.

Smedberg has not presented sufficient evidence to bring his

equal protection claim before a jury.  Smedberg claims that he and Dubin are similarly situated, and that Dubin was not disciplined despite the fact that Dubin "had engaged in the same acts as the plaintiff: (1) Dubin knew about the logbook entries and did not report such 'falsifications' to a supervisor; (2) Dubin had himself not accurately entered his correct time into the logbook; and (3) Dubin worked out at the National Guard gym while on duty."  (Dkt. # 58.)  The undisputed evidence, however, does not support the conclusion that no rational factfinder could find a basis to treat Dubin and Smedberg differently because the factfinding panel found that Smedberg was complicit in Perkins' log falsification concerning the October 10, 2002 shift.  Although Dubin may have made inaccurate entries in the log book at some time given the poor quality of recordkeeping at GOL, the panel made a specific finding with respect to Smedberg and Perkins regarding six and one half hours of Perkins's eight hour shift on October 10, 2002.  As such, a rational person could determine that the degree and specificity of the panel's finding with respect to Smedberg was a principled reason to treat him differently than Dubin.  Defendants' motion is granted with respect to Smedberg's equal protection claim.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (dkt. # 46) is **GRANTED.**  Judgment shall enter in favor of

each defendant on each of Smedberg's claims.  The Clerk shall close this file.

    So ordered this 30th day of March, 2006.

                                        **/s/DJS**
                          _____
                            **DOMINIC J. SQUATRITO**
                         **UNITED STATES DISTRICT JUDGE**